BAKER, Judge,
dissenting.
I respectfully dissent with the majority’s conclusion that the trial court erred in entering summary judgment for Catholic Charities. In my view, Catholic Charities satisfied its burden and made a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.
In accordance with Indiana Code section 31-19-5-15, Catholic Charities could check *991 the putative-father registry at any time, and when the agency worked with M.S., there was no written policy to check the putative-father registry prior to a child’s birth. Appellant’s App. p. 155. Rather, Catholic Charities’s written policy merely required it to check the registry one day after the deadline that a putative father had to register. Id. at 154-55. In practice, Catholic Charities would check the registry when a birth mother first contacted the agency and again just before the birth. While it may indeed be the better policy for an adoption agency to check the registry before the child is actually placed with the adoptive parents, our statutes do not impose such a requirement.[6]
As the majority points out, it was determined that as far as Catholic Charities knew as of May 25, no one had registered as the child’s putative father. In other words, the first time that Catholic Charities checked the registry after M.S. had her baby, the agency was informed that no father had registered. Appellants’ App. p. 85. A check was performed and nothing was found, even though the father had registered almost one month earlier. Id. at 90.
It was not until Catholic Charities requested a second search on June 1, 2010, that the agency learned someone had indeed registered as the child’s putative father. Op. at 987. The registration was signed on April 27, 2010, and there was no explanation why the search on May 25 did not reveal the father’s registration.
Perhaps the reasonable inference is that the registration document executed by the putative father had not been properly filed until after the first search was conducted. Hence, no prior search by Catholic Charities would have found the putative father. And if an earlier check would not have found the father’s registration, the Kram-ers would have accepted the child even if Catholic Charities had checked the registry before placing the baby with them. In any event, it is undisputed that the father registered before the child was born, and there is no showing that Catholic Charities’s failure to check the registry proximately caused any alleged injuries to the Kramers.
I also note that the release that the Kramers signed nonetheless establishes that they understood that the child’s father could claim the baby even after he or she had been placed with them. In other words, the Kramers were notified that the placement was “at risk” because, as pointed out above, our adoption statutes provide biological parents time to reconsider or come forward after the child is born. I.C. § 31-19-5-12. Of course, the Kramers knew that they might bond with the child and still have to give the baby to the father. Indeed, even if Catholic Charities had checked the putative father registry every day from the day that the child was born, such a risk would not have been eliminated. Simply put, the Kramers were expressly aware that the father might appear whether Catholic Charities checked the registry or not.
It is also my view that a “registry check” is not a proper duty to be imposed. Insofar as I have alluded to above, the placement would remain risky. The father could register at a later date and claim the *992 child in accordance with the relevant statutes. The designated evidence demonstrates that Catholic Charities discussed this possibility with the Kramers even before they knew that a birth mother was interested in placing her child with them. Appellant’s App. p. 120. By accepting the placement despite its risks, the Kramers had the opportunity to begin bonding with what was likely to be their child almost from the moment at birth.
Finally, I agree with the notion advanced by Catholic Charities that permitting adoption agencies to avoid liability for a parent enforcing his parental rights through no effort of the agency is for the public good. Agencies can keep their costs down and focus their attention on serving pregnant women and families seeking to provide good homes for children. The release/agreement that the Kramers signed permits adoption agencies to continue to serve the public without fear of being blamed whenever a birth mother changes her mind or a putative father appears at the last minute.
Even more compelling, such goals can be accomplished without permitting agencies to totally avoid liability if and when they engage in truly wrongful behavior.[7] But those circumstances are not present here. Again, the Kramers knew almost from the beginning of the adoption process that a putative father could register up to thirty days after a child is born and take the baby despite the child’s placement for adoption. In other words, the designated evidence established that the Kramers had actual knowledge of this risk. A pre-placement check would have merely indicated that no man had registered as the baby’s putative father.
For the reasons set forth above, I believe that the trial court properly determined that the Kramers’s negligence claims against Catholic Charities are barred. Thus, I would affirm the trial court’s grant of summary judgment in favor of Catholic Charities.

. As the majority points out, Indiana Code section 31-19-5-12 provides that the putative father has up to thirty days after the child’s birth to fill out a form that includes the mother’s name and file it with the Indiana State Department of Health. Under Indiana Code section 31-19-5-18, a father who fails to register as above, loses his right to notice of adoption proceedings and impliedly consents to the adoption. However, the statutes do not preclude a putative father from performing the registration process set forth above prior to the child’s birth.

. Such an example might occur if an adoption agency had actual knowledge that the baby's father had registered but the prospective adoptive parents were not informed of this fact.